UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OMA CONSTRUCTION, INC., <br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>TEAMSTERS LOCAL 174,<br><br>　　　　　　　Defendant. | CASE NO. 2:22-cv-01631-LK<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER |

　　　　This matter comes before the Court on Defendant Teamsters Local 174's motion for a protective order to preclude Plaintiff OMA Construction, Inc. ("OMA") from deposing a "top officer of Local 174[.]" Dkt. No. 35 at 1. For the reasons set forth below, the Court grants the motion in part, denies it in part, and allows OMA to take a brief deposition on certain topics.

### I.　BACKGROUND

　　　　OMA provides services related to construction projects, including for the Sound Transit Sounder Commuter and Link Light Rail Projects, in King County, Washington. Dkt. No. 1 at 2. Teamsters Local 174 is a labor union that represents OMA's dump-truck drivers who haul materials to and from construction sites. Dkt. No. 1-6 at 3; Dkt. No. 28-1 at 103–04.

OMA and Local 174 are parties to a collective bargaining agreement ("CBA") as well as several project labor agreements ("PLAs") and Community Workforce Agreements ("CWAs"). Dkt. No. 1 at 2–6.[1] All of the agreements prohibit work stoppages and/or strikes. Dkt. No. 1 at 2–6; *see, e.g.*, Dkt. No. 1-1 at 25 (Sound Transit PLA).

This dispute arose when Local 174-represented employees participated in a five-month strike against five employers in the sand and gravel industry. Dkt. No. 36 at 3. Although OMA was not one of those employers, *id.*, it was still impacted by the strike. When OMA's truck drivers drove to collect materials from those employers, they were met with picketers who questioned them, called them "scabs," and briefly blocked their entrance and/or exit from the sites. Dkt. No. 34 at 2. Some OMA employees did not cross the picket lines, which left the company unable to access materials to bring to job sites covered by the PLAs and "effectively halted the Company's operations for the duration of the strike." *Id.* at 3 (quoting Dkt. No. 33 at 7).

OMA filed this lawsuit on November 14, 2022, alleging that despite the contractual prohibition on strikes and work stoppages, Local 174 "initiated a work stoppage and/or strike" on December 3, 2021. Dkt. No. 1 at 6. OMA's complaint asserts two claims: (1) breach of the PLAs, *id.* at 6–8, and (2) breach of the CBA, *id.* at 8.

In October 2023, OMA filed a motion to amend its complaint to add a claim for breach of the implied duty of good faith and fair dealing based on the allegation that Local 174 "told its members that they could not cross the picket line at source locations." Dkt. No. 24-2 at 7, 9–10; *see also* Dkt. No. 24. The Court denied that motion because OMA did not demonstrate good cause to amend its complaint six months after the deadline passed. Dkt. No. 34 at 1.

This discovery dispute arises out of OMA's request to depose Local 174 officer Rick Hicks.

---

[1] OMA refers to the public works jobs under the PLAs and CWAs interchangeably as "PLA jobs." Dkt. No. 28-1 at 109.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER - 2

Dkt. No. 35 at 1; Dkt. No. 37 at 1. Mr. Hicks holds several positions, including (1) Secretary-Treasurer, the top executive officer of Local 174; (2) Western Region Vice President of the International Brotherhood of Teamsters; and (3) President of Teamsters Joint Council 28, a joint council of 12 Teamsters affiliates in Washington, Alaska, and Idaho. Dkt. No. 36 at 1–2. Local 174 listed Mr. Hicks as a witness in its initial disclosures in January 2023, but removed his name from its third supplemental initial disclosures in February 2024 after OMA sought his deposition. Dkt. No. 38 at 4; Dkt. No. 37 at 6 (declaration from Local 174's counsel stating that "[a]fter substantial discovery, now that Local 174 has a better understanding of OMA's theories in this case, Local 174's February 2024 disclosures removed Mr. Hicks as a witness upon whom Local 174 may use to support its defenses because Local 174 realized that his testimony is entirely unnecessary.").

In response to OMA's request to depose Mr. Hicks, Local 174 wrote that OMA should first take the depositions of other Local 174 witnesses because "Mr. Hicks has no personal knowledge of any material fact that is not equally available from others with greater availability." Dkt. No. 37 at 2. OMA then deposed Carl Gasca, Local 174's business agent assigned to OMA, and Patricia Warren, Local 174's director of negotiations. Dkt. No. 36 at 4 (listing their titles); Dkt. No. 37-1 at 187–202 (deposition transcript excerpts); Dkt. Nos. 39-1, 39-2 (same).

Following months of email exchanges about the issue, the parties met and conferred by Zoom. Dkt. No. 37 at 1–2. They have been unable to resolve the dispute and this motion followed.

## II.   DISCUSSION

A.   **Legal Standards**

Pursuant to Federal Rule of Civil Procedure 26(b)(1), parties are entitled to discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" A party may depose "any person, including a party, without leave of court[.]"

1  Fed. R. Civ. P. 30(a)(1). Ordinarily, "a strong showing is required before a party will be denied
2  entirely the right to take a deposition." *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.
3  1975) (citation omitted). District courts have discretion to limit discovery "for good cause . . . to
4  protect a party or person from annoyance, embarrassment, oppression, or undue burden or
5  expense[.]" Fed. R. Civ. P. 26(c)(1); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984) ("Rule
6  26(c) confers broad discretion on the trial court to decide when a protective order is appropriate
7  and what degree of protection is required.").

Some courts have recognized "a particular danger for abuse or harassment in requests to depose high-level executives or officials, or 'apex' depositions[.]" *Encinas v. Univ. of Wash.*, No. 2:20-CV-01679-TL, 2023 WL 6066522, at *2 (W.D. Wash. Sept. 18, 2023). To curb the potential for abuse and determine whether an apex deposition is warranted, those courts have considered "(1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Rookaird v. BNSF Ry. Co.*, No. C14-176-RSL, 2015 WL 11233096, at *1 (W.D. Wash. July 8, 2015); *accord Robinett v. Opus Bank*, No. C12-1755-MJP, 2013 WL 5850873, at *5 (W.D. Wash. Oct. 30, 2013).[2] "A claimed lack of knowledge, by itself, or the fact that the apex witness has a busy schedule, are both insufficient bases to foreclose" an otherwise proper apex deposition. *Finisar Corp. v. Nistica, Inc.*, No. 13-CV-03345-BLF (JSC), 2015 WL 3988132, at *2 (N.D. Cal. June 30, 2015); *accord Rookaird*, 2015 WL 11233096, at *2.

Other courts, including the Sixth Circuit, have questioned or rejected the "apex doctrine." *See, e.g.*, *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012) ("[T]he 'apex doctrine'

---

[2] This test is similar to, and is sometimes equated with, the "extraordinary circumstances" doctrine. Under that doctrine, a high-ranking government official or agency may only be deposed if (1) there exists bad faith on the part of the agency or high-level official a party seeks to depose; (2) the information sought is essential to the case; and (3) the information sought cannot be obtained in any other way. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 702 (9th Cir. 2022).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER - 4

appears to assume that harassment and abuse are inherent in depositions of high-level corporate officers and therefore allow[s] such depositions to be barred absent a showing that the individual possesses relevant evidence which is not readily obtainable from other sources." (cleaned up)); *see also* Hon. Iain D. Johnston, *Apex Witnesses Claim They Are Too Big to Depose*, 41 No. 1 Litigation 41 (ABA, Fall 2014). In rejecting the doctrine, the court in *Serrano* held that an apex official may not avoid deposition on a de facto assumption that the deposition would be unduly burdensome, but instead must prevail in the traditional balancing test between "the burdens on the deponent" and "the need for access to information relevant to the case, thus ensuring compliance with Rule 26(c)(1)." *Serrano*, 699 F.3d at 902; *see also Brian J. Lyngaas, D.D.S., P.L.L.C. v. Solstice Benefits, Inc.*, No. 22-10830, 2023 WL 6302998, at *3 (E.D. Mich. Sept. 27, 2023) ("[A] corporate officer may not avoid deposition simply by nature of their position"; such officer is "still subject to requirements of Rule 26(c)(1) in determin[ing] whether a deposition is unduly burdensome."); *Powertech Tech., Inc. v. Tessera, Inc.*, No. C 11-6121 CW, 2013 WL 3884254, at *1 (N.D. Cal. July 26, 2013) ("The burden under the apex principle is supplied by the general rule applicable to a party that seeks to avoid discovery in general." (cleaned up)). Under this view, rather than establishing hard and fast requirements, a court "should be sensitive to the risk of abuse where an executive has no real information, and as with any other protective order, should look for guidance to a balance of the likelihood of oppression or harassment compared to the value of the inquiry in generating important information." *Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 WL 6059770, at *2 (N.D. Ill. Dec. 7, 2017).

Here, the result is the same under either approach.

**B.     OMA May Take a Limited Deposition of Mr. Hicks**

Local 174 argues that the Court should issue a protective order prohibiting OMA from deposing Mr. Hicks because he is a "high-ranking officer" with the Local 174 and "has no unique,

personal knowledge of any fact material to this case that is not also available from a less intrusive source." Dkt. No. 35 at 13. The Court disagrees.

1. <u>Mr. Hicks' Knowledge Regarding His June 17, 2022 Letter and Messaging to Others</u>

OMA argues that Mr. Hicks has personal knowledge about whether Local 174 told or encouraged some drivers not to cross the picket lines. Dkt. No. 38 at 3. Mr. Hicks wrote a letter on June 17, 2022, soon after the strike ended, to the leader of another union stating that the Teamsters would honor that union's strike, if one occurred, because "Teamsters members do not cross picket lines." Dkt. No. 36 at 4–5; Dkt. No. 37-1 at 15. OMA seeks to depose Mr. Hicks "to explore if this was the consistent message to Union members during the concrete strike[.]" Dkt. No. 38 at 4. Although Local 174 argues that Mr. Hicks did not convey that message to the drivers directly, Dkt. No. 35 at 10, OMA is entitled to explore whether Local 174 members received the message "at the direction of Mr. Hicks and his peers," as OMA contends. Dkt. No. 38 at 8.[3] Mr. Hicks has personal knowledge about why he wrote the statement, what he meant by it, and whether he conveyed that message to others. In addition, OMA has exhausted other, less intrusive means of discovery. Dkt. No. 39-2 at 6–7 (Mr. Gasca testifying that he had almost no knowledge about Mr. Hicks' letter); *see also Finisar Corp.*, 2015 WL 3988132, at *3 (explaining that a party is not required to exhaust every type of discovery prior to seeking an apex deposition).

Local 174 contends that the letter and Mr. Hicks' testimony about it are irrelevant because he wrote the letter two months after the strike ended. Dkt. No. 40 at 4. However, OMA is entitled to explore whether he held and communicated the same belief in the preceding months. Local 174 also argues that the letter is not relevant to any of OMA's three breach of contract theories that

---

[3] Mr. Hicks has submitted a declaration stating that he does not recall having certain communications with Local 174's business agents and "[a]t most" he may have discussed the drivers' right to honor the picket lines. Dkt. No. 36 at 4. However, OMA "is entitled to test that lack of knowledge or recollection." *Grateful Dead Prods. v. Sagan*, No. C06-7727(JW) PVT, 2007 WL 2155693, at *1 n. 5 (N.D. Cal. July 26, 2007).

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER - 6

remain after the Court denied OMA's motion to amend its complaint. Dkt. No. 35 at 9–10. However, Local 174 acknowledges that OMA is pursuing a breach of contract theory that Local 174 "threatened OMA drivers not to cross concrete strikers' picket lines[.]" *Id.* at 9. As OMA argues, "whether [Local 174] encouraged or instructed [OMA's] truck drivers . . . not to cross picket lines resulting in the work stoppage and monetary damages" is relevant to that breach of contract theory. Dkt. No. 38 at 2, 8.

Finally, Local 174 argues that "OMA's own witnesses refute [OMA's] theory through their consistent admissions that the Union did not threaten them for exercising their right to cross the concrete strikers' picket lines." Dkt. No. 35 at 9. But some witnesses have stated that Local 174 told or encouraged them not to cross the picket lines. Dkt. No. 37-1 at 90, 92 (driver Shawn Hanna testifying that a Local 174 steward recommended against crossing the picket line); Dkt. No. 39-3 at 3–5 (driver Troy Naasz testifying that a Local 174 shop steward "tried to enforce not crossing the picket lines" "pretty much every time" they talked, instructed Naasz not to do it, and called him a "scab"); *id.* at 6–7 (describing a meeting when Gasca thanked Local 174 members for not crossing picket lines); Dkt. No. 39-5 at 4–5 (driver Chung Bui testifying that he felt threatened when he crossed a picket line and a picketer charged at his truck); Dkt. No. 39-6 at 4 (driver Daniel Weaver testifying that his takeaway from a conversation with Gasca was that Gasca did not want him crossing the picket lines). These incidents appear consistent with Mr. Hicks' statement, reinforcing the relevance of the letter and Mr. Hicks' testimony about it. *See* Dkt. No. 38 at 3. OMA is entitled to ask Mr. Hicks about the letter and whether he conveyed a message not to cross the picket lines.

2. <u>Mr. Hicks' Knowledge Regarding Other Topics</u>

OMA argues that it is entitled to Mr. Hicks' testimony about additional topics because he "participated in providing discovery in this lawsuit, could have participated in the CBA at issue in

this case, had conversations with [OMA]'s owner and President regarding whether Union members could cross the picket lines, and participated in at least one discipline of a Union member that violated picketing procedures." *Id.* at 4.[4] The Court addresses those issues in turn.

To respond to OMA's discovery requests, the Teamsters "tech person" searched Mr. Hicks' emails and Mr. Hicks searched his phone—as Ms. Warren "sat there" with him—for potentially responsive text messages. Dkt. No. 39-1 at 8–9. Although Mr. Hicks has first-hand knowledge of that process, Ms. Warren's testimony shows that Mr. Hicks' knowledge is not unique and his testimony on the topic would be repetitive. *Id.* In addition, as Local 174 argues, Mr. Hicks' knowledge of the process is irrelevant in the absence of any allegation that Local 174's search process and/or document production was deficient. Dkt. No. 35 at 13.

Next, OMA argues that Mr. Hicks may have been involved in negotiating the work stoppage provision of the CBA. Dkt. No. 38 at 4, 9–10. Local 174 does not dispute the relevance of that provision or of the negotiations generally, but argues that Ms. Warren, not Mr. Hicks, negotiated the relevant terms. Dkt. No. 35 at 10; *see also* Dkt. No. 36 at 4 (Mr. Hicks' declaration stating that he "helped negotiate the economics" of the relevant CBA "but was not involved in the negotiations of non-economic terms").[5] Ms. Warren testified that she "co-chair[s] a lot of the large negotiations with [Mr.] Hicks," Dkt. No. 37-1 at 190, and she does not remember how much she was involved in negotiating this CBA, *id.* at 193. "[T]he party seeking to take the deposition need not prove conclusively that the deponent certainly has unique non-repetitive information; rather,

---

[4] In support of its contentions, OMA cites to deposition testimony "outlined in Exhibits G and H to the Hammond Decl. ¶¶ 8-9." Dkt. No. 38 at 4 n.1–2. OMA's vague citations to its lengthy letters, *see* Dkt. Nos. 39-7, 39-8, are unhelpful and fail to comply with Local Civil Rule 10(e)(6), which requires that citations to depositions include page and line numbers and that citations to exhibits include page numbers. For its part, Local 174 failed to highlight the relevant portions of any of the deposition transcripts it submitted, in violation of Local Civil Rule 10(e)(10). *See, e.g.*, Dkt. No. 37-1 at 32–38, 44–58. Future noncompliant filings may be stricken and/or result in the imposition of sanctions.

[5] Local 174 cites to pages 35–37 of the transcript of Ms. Warren's deposition, Dkt. No. 35 at 10, but pages 36–37 are not in the record, Dkt. No. 37-1 at 193–195.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER - 8

where a corporate officer may have any first-hand knowledge of relevant facts, the deposition should be allowed." *Finisar Corp.*, 2015 WL 3988132, at *2 (cleaned up). Here, it appears that Mr. Hicks may have personal knowledge regarding the negotiations that is not repetitive, and OMA may question him in this area.

OMA also notes that Mr. Hicks has personal knowledge of his conversations with Barry O'Young, OMA's Owner and President, about drivers crossing the picket lines. Dkt. No. 38 at 7, 10; *see also* Dkt. No. 36 at 5 (Mr. Hicks stating that he "asked Mr. O'Young why he was putting his OMA drivers in a position to cross our picket lines").[6] Again, Mr. Hicks' communications about crossing the picket lines are relevant to OMA's breach of contract theory. And Local 174 concedes that the conversations may also be relevant to its affirmative defense that "OMA failed to mitigate its damages and/or caused itself its alleged harms." Dkt. No. 35 at 12 (citing Dkt. No. 19 at 6). Mr. Hicks' testimony regarding the conversations would not be repetitive because Ms. Warren has no first-hand knowledge of them, Dkt. No. 39-1 at 4–5, and OMA is entitled to hear his perspective of the conversations even if it already knows Mr. O'Young's side of it. Local 174 suggests that OMA propound written discovery on the topic, Dkt. No. 35 at 13, but discovery responses written by counsel are not the same as a back and forth with a live deponent who has first-hand knowledge. And now that the Court has allowed OMA to depose Mr. Hicks regarding his letter, it is not significantly more burdensome to allow questioning on this topic as well. OMA is permitted to question Mr. Hicks about his conversations with Mr. O'Young about drivers crossing the picket lines.

OMA also argues that it should be allowed to question Mr. Hicks about his conversations with Ms. Warren about the lawsuit because he has personal knowledge of those conversations.

---

[6] Local 174 also notes that the two discussed a potential change order, Dkt. No. 35 at 12, but OMA does not argue that that part of the discussion is relevant, Dkt. No. 38 at 7, 10.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER - 9

Dkt. No. 38 at 7, 10. OMA has not explained why those conversations are relevant, and as Local 174 notes, Mr. Hicks' opinions regarding the lawsuit are immaterial. Dkt. No. 35 at 12.

Turning to what OMA refers to as the "discipline" issue, Ms. Warren testified that Mr. Hicks was present when she had a "conversation" with a Local 174 member regarding the use of inappropriate language and harassing behavior over the bullhorn during the strike. Dkt. No. 39-1 at 10. Local 174 responds that it did not bring internal charges against drivers "for violating picket-line conduct." Dkt. No. 35 at 12. OMA's response to the motion does not seek information regarding internal charges, *see generally* Dkt. No. 38, and the parties seem to be talking past each other on this issue. Regardless, Mr. Hicks has first-hand knowledge of the conversation with the Local 174 member, and that conversation is relevant to Local 174's messaging to its members regarding the picket lines. Although Ms. Warren testified about the conversation, Dkt. No. 39-1 at 10, OMA may question Mr. Hicks about his perspective too because he was present, his testimony will not necessarily be duplicative, and the additional burden of answering such questions is minimal.

In sum, "this is not a case in which a high-level executive has little or no knowledge of the issues in the case"; Mr. Hicks is a percipient witness. *Finisar Corp.*, 2015 WL 3988132, at *3. OMA may question him about his June 17, 2022 letter, whether he conveyed a message not to cross the picket lines, negotiation of the work stoppage CBA provision, his conversations with Mr. O'Young, and the conversation with the Local 174 member about his picket line conduct.[7]

However, OMA is not entitled to a full seven-hour deposition to explore these limited topics. True enough, "the fact that an apex witness has a busy schedule is not a basis for foreclosing

---

[7] Mr. Hicks details his busy travel schedule before the April 8, 2024 discovery deadline. Dkt. No. 36 at 3. If the parties are unable to schedule his deposition for a mutually convenient date before the deadline, they should submit a stipulated motion supported by good cause requesting a brief extension of the deadline for that purpose.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER - 10

otherwise proper discovery." *Rookaird*, 2015 WL 11233096, at *2. But given the discrete nature of Mr. Hicks' personal knowledge, a three-hour deposition should suffice. *See, e.g., Finisar Corp.*, 2015 WL 3988132, at *4 (limiting apex deposition to two hours).

### III.  CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Local 174's motion for a protective order. Dkt. No. 35.

Dated this 18th day of March, 2024.

                                            Lauren King
                                            United States District Judge