1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

| | |
|---|---|
| OMA CONSTRUCTION, INC., | CASE NO. 2:22-cv-01631-LK |
| Plaintiff, | ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| TEAMSTERS LOCAL 174, | |
| Defendant. | |

This matter comes before the Court on the parties' cross motions for summary judgment. Dkt. Nos. 55, 61. Plaintiff OMA Construction, Inc. ("OMA") moves for summary judgment on its claims for breach of the parties' agreements, Dkt. No. 61 at 1, and Defendant Teamsters Local 174 ("Local 174" or the "Union") cross moves for summary judgment on OMA's claims, Dkt. No. 55 at 1. The Court heard oral argument on the parties' motions on June 6, 2025. For the reasons set forth below, the Court grants the Union's motion and denies OMA's motion.

## I.   BACKGROUND

OMA provides services related to construction projects, including for the Sound Transit Sounder Commuter and Link Light Rail Projects, in King County, Washington. Dkt. No. 1 at 2.

Local 174 is a labor union that represents OMA's drivers and mechanics. Dkt. No. 64 at 3.

OMA and Local 174 are parties to a collective bargaining agreement ("CBA") and signatories to several project labor agreements ("PLAs") and Community Workforce Agreements ("CWAs"). Dkt. No. 1 at 2–6.[1] The PLAs and CWAs require employees to cross any picket lines established at project sites and prohibit the Union from sanctioning work stoppages, strikes, and other disruptive conduct at project sites. Dkt. No. 1 at 2–6; *see, e.g.*, Dkt. No. 1-1 at 25. This matter concerns whether the Union breached the agreements when some OMA drivers refused to cross picket lines and the Union allegedly encouraged them to honor the picket lines.

**A.    Role of OMA Drivers in Construction Projects**

OMA is a general contractor that specializes in "export material handling and import material allocation in . . . projects"; it also performs some excavation work. Dkt. No. 62-1 at 8. Specifically, it hauls materials away from project sites, including soil, concrete, and asphalt, and brings material such as fresh rock to job sites. *Id.* at 10–12. Local 174 represents OMA's drivers. Dkt. No. 64 at 3. When OMA drivers are tasked by the dispatcher with bringing rocks and similar material to job sites, they drive their trucks to a source site—also known as "aggregate pits" or "pits"—to pick up the material. *Id.* at 23, 25; Dkt. No. 63 at 2; *see also* Dkt. No. 56-1 at 189–90 (aggregate refers to rock and gravel). OMA drivers do not load materials into the trucks, but they do unload the materials and sometimes spread them once they reach their destination. Dkt. No. 62-1 at 11–12, 15, 17; Dkt. No. 62-3 at 7; Dkt. No. 69-3 at 3–4 (describing the spreading process); Dkt. No. 69-4 at 3 ("Spreading is like dumping from your truck. As you're rolling, you['re] spreading the dirt onto the ground.").

---

[1] The parties use the terms "PLA" and "CWA" interchangeably. *See, e.g.*, Dkt. No. 69-1 at 16. The Court does so too.

1

**B.     The Concrete Strike Impacts OMA**

2

This dispute arose when Union-represented employees participated in a five-month strike

3

against five employers in the sand and gravel industry between November 2021 and April 2022 as

4

part of a regional concrete strike. Dkt. No. 64 at 8.[2] During the concrete strike, mixer-truck drivers

5

and plant employees who worked for the sand and gravel companies were striking and picketing

6

at their employers' facilities. Dkt. No. 63 at 2; Dkt. No. 64 at 9.

7

Although OMA was not one of the struck employers, it was still affected by the strike. The

8

Union erected picket lines at four locations—Cadman Redmond, CalPortland Seattle, CalPortland

9

Kenmore, and CalPortland Snoqualmie—that had aggregate pits that sold aggregate to the general

10

public. Dkt. No. 59 at 2–3, 5. Those locations were miles away from any PLA job site. *Id.* at 3.

11

When OMA's truck drivers drove to collect materials from these aggregate or source sites, they

12

were met with picketers and were sometimes unable to pick up materials for projects. Dkt. No. 63

13

at 2; Dkt. No. 64 at 9. Some OMA drivers chose to honor—that is, not cross—the picket lines,

14

while others chose to cross them and pick up materials. Dkt. No. 71-1 at 9, 32–33. When OMA

15

drivers refused to cross the picket lines, OMA's dispatcher was sometimes—but not always—able

16

to reroute them to pick up materials elsewhere. *Id.* at 24–25, 28, 31, 256–57.

17

During the concrete strike, Local 174 officer Rick Hicks called Barry O'Young, OMA's

18

Owner and President, to ask why OMA employees were crossing the Union's picket lines at the

19

source sites. Dkt. No. 63 at 2. Mr. Hicks was surprised that OMA was sending drivers to the

20

Union's picket lines at the sand and gravel employers because he believed that the strike would

21

not impact OMA. Dkt. No. 62-6 at 13. Mr. Hicks stated during the phone call that the concrete

22

strike picket lines were not at the job sites covered by the PLAs or CWA. Dkt. No. 63 at 2. Mr.

23

24

---

[2] The five struck employers were Cadman, Glacier Northwest d/b/a CalPortland (CalPortland), Salmon Bay Sand & Gravel, Stoneway Concrete, and Lehigh Cement. *Id.* at 7.

O'Young responded that those locations were "the only place that product was approved" for OMA drivers to bring to the PLA job sites. Dkt. No. 62-6 at 13. Mr. Hicks offered to find the product elsewhere, at non-struck locations, to avoid the bad "optics" of Union members crossing a picket line, and Mr. Hicks later informed Mr. O'Young that OMA could obtain its materials elsewhere if the company put in a change order request. *Id.* at 13–16. Mr. O'Young concluded from the phone call that Mr. Hicks did not want OMA drivers to cross the picket lines. Dkt. No. 63 at 2.

During his deposition, Mr. Hicks confirmed his expectation "that no Teamster member would ever cross a picket line, no matter who or where, that is [his] expectation in life." Dkt. No. 62-6 at 17. He did not need to communicate that message directly to Union members because "[e]verybody knows what the expectation of a Teamster is. It is everyone's expectation, you don't cross picket lines." *Id.* at 17–18; *see also id.* at 18 (the Teamsters' "slogan" is that "Teamsters don't cross picket lines").

Patricia Warren, the Union's Director of Negotiations, informed the Union's business agents that if OMA workers had questions about whether they could cross the picket lines, the business agents should tell them that "their CBA gives them the right to honor a picket line but it is their individual choice whether to exercise that right or not[.]" Dkt. No. 64 at 1, 10. The Union told its members, including OMA employees, that the Union "want[ed] them to honor a picket line, that's solidarity, that's what Teamsters do," but it was their choice to honor the picket lines or not. Dkt. No. 62-5 at 29. Charmaine Monk, OMA's dispatcher, testified during her deposition that OMA employees told her that Local 174's Senior Business Agent Carl Gasca called OMA employees, sometimes after hours, stating that he had received reports that they had crossed the picket line, and "wanted to know why they made that decision." Dkt. No. 62-2 at 16. Kenneth Knipp, a Union shop steward, told employees his personal beliefs that "if you're a union guy, you

don't cross the picket line," and "you won't want to cross the picket line[.]" Dkt. No. 62-3 at 10.

Mr. Knipp repeatedly told OMA driver Troy Naasz not to cross the picket line and called him "a

piece of shit" and "a scab" for doing so.  Dkt. No. 62-7 at 7–8; Dkt. No. 56-1 at 388–89. Mr. Naasz

crossed the picket lines to pick up material at the source sites anyway. Dkt. No. 56-1 at 387.[3] Shop

Steward Holly Steele also instructed OMA driver Dan Weaver not to cross the picket line. Dkt.

No. 56-1 at 468–70. OMA's economic expert opined that OMA sustained $6,394,607.55 in

damages as a result of work stoppages during the concrete strike. Dkt. No. 63 at 2.

The Union did not establish picket lines at any facility owned by OMA during the concrete

strike. Dkt. No. 64 at 9. The Union also had a "hard and fast rule" that its members could not picket

at a construction site covered by a PLA or CWA and communicated that position to its members.

Dkt. No. 62-5 at 25–26. No construction occurs at the sand and gravel employers' facilities. Dkt.

No. 64 at 7. Finally, no OMA driver went on strike during the relevant 2021–2022 time period,

and the Union did not authorize OMA drivers to strike. Dkt. No. 57 at 10; Dkt. No. 59 at 3.

## C.    The Relevant Agreements

### 1.    The Collective Bargaining Agreement

The relevant CBA was negotiated between OMA and the Union and ran from August 1,

2019 through May 31, 2022. Dkt. No. 64 at 3. Two provisions of the CBA are relevant here. The

first involves discrimination and picket lines in the "Discrimination-Picket Lines" section:

> Section 3.01 The parties recognize the rights of employees under the National
> Labor Relations Act [("NLRA")]. The parties agree that neither party shall
> discriminate against, discipline or discharge any employee's lawful union activities
> including the individual right of employees to lawfully observe picket lines.

---

[3] OMA also submitted declarations from retired OMA drivers Louis Larson, Chung Bui, and Dan Weaver, but the Court does not consider these declarations for purposes of this motion because they are not sworn under penalty of perjury as required. Dkt. Nos. 62-11, 62-12, 62-13; 28 U.S.C. § 1746; *see also Young v. Allstate Co.*, 662 F. Supp. 3d 1066, 1072 (C.D. Cal. 2023) (explaining that declarations were "fatally defective" when they were not signed under penalty of perjury and noting that "[o]nly sworn affidavits—or unsworn declarations that are, *inter alia*, subscribed under penalty of perjury, pursuant [to] 28 U.S.C. § 1746—satisfy the requirement of Rule 56(c)(4)").

Dkt. No. 1-6 at 5. During contract negotiations, OMA's representative agreed that employees have the right under the NLRA to honor other employees' picket lines—that is, the picket lines of workers striking their own employer at their employer's places of business. Dkt. No. 64 at 4. Second, the CBA includes a no-strike clause in the "Settlement of Disputes" Section:

> Section 13.01: In cases of violation, misunderstandings or differences in interpretation or other disputes arising under this Agreement, there shall be no reduction or stoppage of work. Both parties pledge their cooperation in eliminating the above-mentioned possibilities.

Dkt. No. 1-6 at 16.

### 2.    The Project Labor Agreements

Also at issue are PLAs that government entities—here, the City of Seattle, King County, the Port of Seattle, Sound Transit, and the Seattle Public School System—negotiated "to set union-scale wages and benefits applicable to all contractors hired to perform construction projects bid by that governmental entity." Dkt. No. 64 at 7. A PLA "is a pre-hire agreement[] between an owner and labor" which "[c]ontractors sign on [to] when they are awarded a contract, and it dictates the terms and conditions of the project." Dkt. No. 56-1 at 224; *see also id.* at 83, 118, 120.

The PLAs at issue here were negotiated between a governmental purchaser of construction services and a coalition of Building Trades unions. Dkt. No. 58 at 2. Construction subcontractors—including OMA—did not participate in the negotiations for the PLAs. *Id.* OMA was required to and did sign letters of assent to bind itself to the PLAs. Dkt. No. 56-1 at 230; Dkt. No. 62-1 at 21. After it did so, it was approved to work on projects under the PLAs. Dkt. No. 69-1 at 16.

Some OMA drivers refused to cross a Local 174 picket line when they went to a concrete company's facility to pick up materials to be delivered to a Sound Transit work site, Dkt. No. 71-1 at 256–57, but the record does not show that the same was true for other PLA jobs. The Court therefore focuses on the Sound Transit PLA, but sets forth the language of the other PLAs below

as well for completeness and because—as the parties agreed during the hearing—all of the PLAs contain similar relevant provisions. Dkt. No. 1-2 at 9; Dkt. No. 1-3 at 24; Dkt. No. 1-4 at 25–26; Dkt. No. 1-5 at 13.

     *(a) The Sound Transit PLA*

     In 1999, Sound Transit adopted Resolution No. R99-21 to establish its PLA policy. Dkt. No. 56-1 at 131, 231–32. That resolution called for Sound Transit to negotiate a PLA that included certain provisions, including that the PLA "will not apply . . . to off-site activities such as the fabrication and manufacture of equipment and materials, the delivery of equipment and materials, and the installation of such equipment and materials where warranties are affected." *Id.* at 145. Once a proposed agreement was negotiated, Sound Transit passed a motion to authorize its Executive Director to execute the PLA; the motion noted that "[o]ff-site fabrication, manufacture and delivery of material and equipment is not covered by the PLA. However, local prevailing wage rates shall apply to work in order to protect Puget Sound workers." *Id.* at 155, 241–42.

     Sound Transit entered into the PLA at issue in this case to build out its capital expansion portfolio, including the light rail system. *Id.* at 225. The Sound Transit Central Puget Sound Regional Transit Authority Project Labor Agreement for the Construction of Sound Community and Link Light Rail Projects ("Sound Transit PLA") includes the following provisions:

> 15.1 During the term of this Agreement there shall be no strikes, picketing, work stoppages, slow downs or other disruptive activity for any reason by the Union, its applicable Local Union or by any employee, and there shall be no lockout by the Contractor. Failure of any Union, Local Union or employee to cross any picket line established at the Project site is a violation of this Article.

> 15.2 The Union and its applicable Local Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity at the Contractor's project site and shall undertake all reasonable means to prevent or to terminate any such activity. No employee shall engage in activities which violate this Article. Any employee who participates in or encourages any activities which interfere with the normal operation of the Project shall be subject to disciplinary action, including discharge, and if justifiably discharged for the

above reasons, shall not be eligible for rehire on the Project for a period of not less than ninety (90) days.

Dkt. No. 1-1 at 25. "Contractor" is defined to include "all construction contractors and subcontractors of whatever tier engaged in onsite construction work within the scope of this PLA." *Id.* at 3. The Sound Transit PLA applies to new construction for specified rail and train locations and stations, including "other construction related activities necessary to the Sound Transit Project and specifically described below." *Id.* at 5. The Sound Transit PLA does not include a definition for "project site." *See generally id.* And finally, the purpose of the Sound Transit PLA is "to ensure that all the construction work associated with the Project proceeds continuously, efficiently, economically and with due consideration for the protection of labor standards, wages and working conditions as well as to promote fairness in employment for both union and non-union contractors and craft workers, without discrimination." *Id.* at 4.

   *(b) The Port of Seattle PLA*

   The PLA between the Port of Seattle and Seattle/King County Building and Construction Trades Council Southwest Construction Alliance II ("Port of Seattle PLA") includes the following provisions:

   Section 1: During the term of this PLA there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union, its applicable Local Union or by any employee, and there shall be no lockout by the Contractor on Covered Projects. Failure of any Union, Local Union or employee to cross any picket line established at the Covered Project site is a violation of this article.

   Section 2: The Union and its applicable Local Union shall not sanction aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity at the Contractor's Project site and shall undertake all reasonable means to prevent or to terminate any such activity. No employee shall engage in activities which violate this Article. Any employee who participates in or encourages any activities which interfere with the normal operation of the Project shall be subject to disciplinary action, including discharge, and if justifiably discharged for the above reasons, shall not be eligible for rehire on the Project for a period of not less than ninety (90) days.

Dkt. No. 1-2 at 9. Article 2 of the Port of Seattle PLA, titled Scope of the Agreement, states in relevant part, "Except for the activities covered by Section 5 of this Article, any construction work defined in RCW 39.12 will be subject to the PLA. Such work shall include site preparation work and dedicated off-site work, including transportation of equipment and materials to the site." *Id.* at 5. The OMA drivers are paid prevailing wage under Section 39.12 of the Revised Code of Washington for the work performed under all of the PLAs at issue in this lawsuit, including their work picking up materials from source locations and delivering and spreading those materials. Dkt. No. 63 at 2.

> *(c) The SCWA (Seattle Public Schools)*

The Seattle Public Schools Student and Community Workforce Agreement ("SCWA"). Article XVI, Section 1 and 2, "No Work Stoppages and No Lockout," states:

> Section 1. For the project covered by this SCWA, there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union, any applicable local Union or by any worker, and there shall be no lockout by the Contractor. Failure of any Union, local Union or worker to cross any picket line established at Covered Project sites violates this Article.

> Section 2. The Union and every applicable local Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity at the Contractor's project site and shall undertake all reasonable means to prevent or to terminate any such activity. No worker shall engage in activities that violate this Article. Any worker who participates in or encourages any activities that interferes with normal operations on a Covered Project, shall be subject to disciplinary action, including discharge, and if justifiably discharged shall not be eligible for rehire on the project for a period of not less than ninety (90) days.

Dkt. No. 1-3 at 24. The SCWA defines "Covered Project" to mean:

> all SPS administered public works projects, that are estimated by SPS to cost $5 million dollars or more in construction value (excluding contingency) at time of bid except when a project is exempted, and shall include such Projects Bid by SPS after the adoption of the SCWA (October 1, 2020) that are released for Bid within 5 years of that date, unless covered by a separate project specific SCWA executed prior to this Master SCWA.

*Id.* at 4. The SCWA defines "Contractors" as "contractors of any tier, including prime contractors

(as defined) and any other contractors of any tier." *Id.* The SCWA also states that "[a]ll projects covered by this SCWA are hereafter referred to as 'Covered Projects.'" *Id.* The PLA is applicable to "[o]n-site construction work[.]" *Id.* at 8. The SCWA does not define "Covered Project sites" or "project site." *See generally id.*

      *(d) The KCCWA (King County)*

The King County Department of Natural Resources and Parks Wastewater Treatment Division Community Workforce Agreement for the Georgetown Wet Weather Treatment Station Project ("KCCWA"), in Article 18.1 and 18.2 titled "No Strike – No Lockout," states:

> 18.1: During the term of this CWA there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union, its applicable Local Union or by any employee, and there shall be no lockout by the Contractor. Failure of any Union, Local Union or employee to cross any picket line established at the Project Site is a violation of this Article.

> 18.2: The Union and its applicable Local Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity at the Contractor's project Site and shall undertake all reasonable means to prevent or to terminate any such activity. No employee shall engage in activities which violate this Article. Any employee who participates in or encourages any activities which interfere with the normal operation of the Project shall be subject to disciplinary action, including discharge, and if justifiably discharged for the above reasons, shall not be eligible for rehire on the Project for a period of not less than ninety (90) days.

Dkt. No. 1-4 at 25–26. The KCCWA defines "Contractors" as "collectively, the general contractor and all Sub-contractors of every tier." *Id.* at 5.

The KCCWA states that "Project Site" or "Site" "shall be understood to refer to the location at which construction, equipment or services furnished by the Contractor under the Contract and this Agreement will be performed, completed[,] and or delivered." *Id.* at 7. It further states that "[t]he purpose of the CWA is to [e]nsure that all construction work at the Project Site, and operation of the existing facility, will proceed continuously and without interruption, efficiently,

economically, and with due consideration for the protection of labor standards, wages and working conditions." *Id.* at 3.

(e) *City of Seattle CWA*

The City of Seattle City Purchasing and Contracting Services Community Workforce Agreement with Seattle Building and Construction Trades Council and the Northwest National Construction Alliance II ("City of Seattle CWA"), Article VII, states:

> Section 1. During this CWA, there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union, any applicable local Union or by any worker, and there shall be no lockout by the Contractor. Failure of any Union, local Union or worker to cross any picket line established at Covered Project sites violates this article.

> Section 2. The Union and every applicable local Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity at the Contractor's project site and shall undertake all reasonable means to prevent or to terminate any such activity. No worker shall engage in activities that violate this Article. Any worker who participates in or encourages any activities that interferes with normal operations on a Covered Project, shall be subject to disciplinary action, including discharge, and if justifiably discharged shall not be eligible for rehire on the project for a period of not less than ninety (90) days.

Dkt. No. 1-5 at 13.

The City of Seattle CWA states, "This CWA covers every City of Seattle administered public works project estimated to cost $5 million dollars or more at time of bid" unless exempted under circumstances not applicable here. *Id.* at 4. "Such projects are . . . referred to as 'Covered Projects.'" *Id.*; *see also id.* at 6 (providing with respect to the scope of the agreement that "[t]his CWA applies and is limited to the recognized and accepted historical definition of public works under the direction of and performed by Contractors of every tier. Public works, also called project work, shall include site preparation and dedicated off site work"[4] and "[a]ll City of Seattle

---

[4] According to the Union, a dedicated offsite location is created for the sole purpose of serving the construction site. Dkt. No. 55 at 8 (citing Dkt. No. 57 at 4; Dkt. No. 58 at 3). It contends that if an offsite facility serves the general public, it is not a dedicated offsite location. *Id.* OMA does not contest this assertion.

administered public works projects with a project construction budget plus contingency of $5 million and over at the time of bid shall be covered by this CWA" unless exempted).

Finally, the Purpose section of the City of Seattle CWA states, "This CWA is intended to establish a spirit of harmony, peace, and stability between labor and management, to support timely construction of public works projects" and "Unions agree to not engage in any strike, slow-down, or interruption or other disruption or interference with the work covered by this CWA. Contractors agree to not engage in any lockout." Dkt. No. 1-5 at 4–5.

**D.    OMA Files Suit**

OMA filed this lawsuit on November 14, 2022, alleging that despite the contractual prohibition on strikes and work stoppages, Local 174 "initiated a work stoppage and/or strike" on December 3, 2021 when the concrete strike began. Dkt. No. 1 at 6. OMA's complaint asserts two claims: (1) breach of the PLAs, *id.* at 6–8, and (2) breach of the CBA, *id.* at 8.

On October 11, 2023, OMA filed a motion to add a claim for breach of the implied duty of good faith and fair dealing. Dkt. No. 24; Dkt. No. 24-2 at 9–10. The Court denied the motion as untimely. Dkt. No. 34 at 8.

## II.    DISCUSSION

The Court has jurisdiction under the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"). Section 301(a) of the LMRA provides that "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court." 29 U.S.C. § 185(a).

The Union seeks summary judgment on all of OMA's claims. Dkt. No. 55 at 23. OMA responds that it is entitled to summary judgment, but in the alternative, the Union's motion should be denied because there are genuine issues of material fact regarding "the definition of 'project site' in each PLA in dispute, the type of work covered by each PLA, whether or not the Union encouraged OMA drivers not to cross picket lines in violation of OMA's contractual obligations,

and as to the interpretation of Section 13.01 of the CBA." Dkt. No. 67 at 13. Because the parties move for summary judgment on the same claims and issues, the Court considers both motions together. The Court first sets forth the relevant legal standards, and then addresses the parties' cross motions.

**A.    Summary Judgment Standard**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

When parties file simultaneous cross-motions for summary judgment on the same claim, the Court "must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard" (cleaned up)). The Court "giv[es] the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). However, to the extent the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

1    To establish that a fact cannot be genuinely disputed, the movant can either cite the record

2    or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an

3    adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

4    Once the movant has made such a showing, "the nonmoving party must come forward with specific

5    facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

6    *Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up). Metaphysical doubt is insufficient, *id.* at 586,

7    as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to

8    "scour the record in search of a genuine issue of triable fact"; rather, the nonmoving party must

9    "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v.*

10    *Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247,

11    251 (7th Cir. 1995)). The Court will enter summary judgment "against a party who fails to make

12    a showing sufficient to establish the existence of an element essential to that party's case, and on

13    which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

14    (1986).

15    **B.    Breach of Contract Standard**

16    Section 301 of the LMRA "authoriz[es] federal courts to create a uniform body of federal

17    common law to adjudicate disputes that arise out of labor contracts." *Curtis v. Irwin Indus., Inc.*,

18    913 F.3d 1146, 1151 (9th Cir. 2019). Thus, Section 301 preempts state law if the claim seeks

19    "purely to vindicate a right or duty created by the CBA itself[.]" *Id.* at 1152–53. Because OMA

20    seeks purely to vindicate its rights under the CBA and PLAs, the Court applies federal, not state,

21    law to interpret the contracts at issue.[5] Under federal law, a plaintiff must establish the existence

22

23    ─────────────────────────

24    [5] OMA relies on Washington's breach of contract standards in its motion for summary judgment, Dkt. No. 61 at 16–
17, but it does not dispute the Union's assertion that federal law applies, Dkt. No. 55 at 16–17; *see generally* Dkt. No.
67 (OMA's response to the Union's motion for summary judgment).

of a valid contract, defendant's breach, and resulting damages. *See, e.g.*, *Bd. of Trs. of Cal. Ironworkers Field Pension Tr. v. Paz-Fairfax Steel, Inc.*, No. EDCV 21-1853 JGB (SHKx), 2023 WL 3333639, at *3 (C.D. Cal. Mar. 28, 2023).

Under federal common law, courts "interpret collective-bargaining agreements . . . according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). "[A]s with any other contract, the parties' intentions control," *id.* (citation omitted); "[w]hen the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further," *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 141 (2018) (per curiam). Courts interpret CBAs' written terms in "the context of the entire agreement's language, structure, and stated purpose." *Trs. of S. Cal. IBEW-NECA Pension Tr. Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir. 2008). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Tackett*, 574 U.S. at 435 (citation omitted).

"A contract is not ambiguous unless it is subject to more than one reasonable interpretation[.]" *CNH Indus. N.V.*, 583 U.S. at 134. When a contract is ambiguous, "courts can consult extrinsic evidence to determine the parties' intentions," *id.* at 139, and the parties' intent at the time they executed the contract controls, *Bd. of Trs. of Watsonville Frozen Food Welfare Tr. Fund v. Cal. Coop. Creamery*, 877 F.2d 1415, 1426 (9th Cir. 1989). When examining intent, courts can consider "the circumstances surrounding the contract's execution, including the preceding negotiations" and "the parties' conduct subsequent to contract formation," which is "given great weight." *Cal. Co-op. Creamery*, 877 F.2d at 1426 (citation omitted); *see also Children's Hosp. Med. Ctr. of N. Cal. v. Cal. Nurses Ass'n*, 283 F.3d 1188, 1195 (9th Cir. 2002) (explaining that extrinsic evidence can include "the bargaining history, the context in which the contract was

negotiated, the interpretation of the contract by the parties, and the conduct of the parties bearing upon its meaning") (citation omitted). District courts should also "consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements." *Ariz. Laborers, Teamsters & Cement Masons Loc. 395 Health & Welfare Tr. Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1518 (9th Cir. 1985) (citation omitted).

**C.    Sections 7 and 8 of the NLRA**

Two provisions of the NLRA provide the legal backdrop to this dispute. Section 7 of the NLRA provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157. That section has been interpreted to protect employees' right to honor others' picket lines and to engage in a sympathy strike, which is a strike "conducted by workers belonging to one bargaining unit in support of a primary strike that is conducted by workers belonging to another bargaining unit at the same plant or shop." *Children's Hosp. Med. Ctr.*, 283 F.3d at 1191; *see also Std. Concrete Prods. Inc. v. Gen. Truck Drivers, Office, Food & Warehouse Union, Loc. 952*, 353 F.3d 668, 676 (9th Cir. 2003) ("Section 7 . . . guarantees workers and unions the right to engage in a sympathy strike, i.e., to refuse to cross the picket line of another bargaining unit that is on strike against its employer.").

The right to engage in strikes, including sympathy strikes, may be waived in a collective bargaining agreement. *Children's Hosp. Med. Ctr.*, 283 F.3d at 1192. However, such a waiver must be "clear and unmistakable." *Id.* at 1191 (quoting *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983)). "The rationale for applying the 'clear and unmistakable' standard to waivers of strike

rights is this: if a union is negotiating away employees' rights that are fundamental to the collective bargaining process, any proposed contract must unambiguously put those employees on notice of the waiver." *Id.* The clear and unmistakable standard also applies to waivers of employees' right to honor picket lines. *Id.* at 1191–92. A general no-strike provision "does not, simply by virtue of its incorporation in a collective bargaining agreement, constitute such a clear and unmistakable waiver." *Id.* at 1192.

Section 8(e) of the NLRA "forbids entry into a collective-bargaining agreement whereby an employer agrees to refrain [from] dealing in the product of another employer or to cease doing business with any other person." *Joint Council of Teamsters No. 42*, 248 NLRB 808, 813 (1980). Section 8(e)'s "construction proviso" is an exception to that requirement and allows entities to require the use of union subcontractors in the construction industry relating to work to be done at the site of construction. 29 U.S.C. § 158(e). The proviso applies to onsite construction work, but not to "merely" delivering "supplies or other products or materials shipped or otherwise transported to and delivered on the site of the construction" without any further action by the employees delivering the materials. *Local 294, Teamsters*, 195 NLRB 378, 381–82 (1972).

**D.    The Union Did Not Violate the PLAs**

   1.   The PLAs' Prohibition on Strikes and Requirement to Cross Picket Lines Applied Only at Project Sites

The Union argues that it did not violate the PLAs because the PLAs do not prohibit strikes by concrete mixer-drivers or picketing at locations away from any construction jobsite. Dkt. No. 55 at 18. The Union also contends that in light of the NLRA's construction proviso, the PLAs are lawful only to the extent they are limited to "work . . . done at the site of the construction[.]" Dkt. No. 72 at 2 (quoting 29 U.S.C. § 158(e)). The Union further avers that the PLAs do not apply to offsite activities, such as the delivery of material, unless the work is done at a "dedicated" offsite

1    facility, and the aggregate pits were not dedicated offsite facilities because they were open to the

2    public. Dkt. No. 55 at 18 & n.11.

3         The Union also asserts that the PLAs' no strike clauses "are likewise limited to onsite

4    construction work." *Id.* at 18. According to the Union, "because 'work,' as used throughout the

5    PLA, refers to covered onsite construction work, a 'strike,' 'work stoppage,' and 'slow down'

6    necessarily refer to a stoppage or slowing of covered onsite construction work." *Id.* (noting that

7    "strike" is a "concerted stoppage of work by employees" (quoting 29 U.S.C. § 142(2))). The Union

8    further contends that limiting the no-strike clause to onsite work reflects the bargaining parties'

9    intent to grant unions and their members access to high-paying, publicly funded jobs at particular

10   jobsites in exchange for labor peace at those jobsites. *Id.* at 19.

11        OMA counters that the PLAs obligate covered workers to cross picket lines at the physical

12   location where construction is occurring *and* at other locations where they are performing PLA

13   work. Dkt. No. 67 at 6. It argues that the Union's witnesses who state contrary positions are merely

14   expressing their personal opinion about the scope of a "job site." *Id.* at 7.[6] OMA also notes that a

15   Sound Transit representative testified that some offsite work is covered by the Sound Transit PLA

16   and the determination of what is covered is fact-specific. *Id.* at 8. It further contends that the public

17   entities' conclusions that the concrete strike did not violate the PLAs, *see, e.g.*, Dkt. No. 56-1 at

18   517, 525, 531, 540, is irrelevant here because these determinations were made with respect to the

19   concrete drivers, not the OMA drivers, and the concrete employers were not signatories to the

20   PLAs. *Id.* at 14; *see also* Dkt. No. 67 at 3. Finally, it argues that the Union encouraged a work

21   stoppage despite the PLAs' no strike clause by encouraging its employees not to cross the picket

22   lines at the source sites. Dkt. No. 74 at 2.

23   _____

24   [6] OMA notes that the PLAs and the Union's motion "use various phrases such as 'project site,' 'job site,' or 'onsite'
interchangeably." *Id.* at 7 n.1; *see also id.* at 14 (referring to these terms as "interchangeable phrases").

The parties agree that resolution of this issue turns on the scope of the term "project site." Dkt. No. 61 at 9–10 (OMA asserting that "[a]t issue in the PLAs is the definition of 'project site' or 'covered project' and whether obtaining materials from a source location is encompassed in these definitions," and contending that the term "included the OMA drivers and their work under the Sound Transit PLA"); Dkt. No. 74 at 5–6 (OMA arguing that the definition of onsite work is fact based and can include all work covered by the PLAs); Dkt. No. 72 at 1 (the Union contending that "PLA-covered 'project sites' are limited to the physical location where construction occurs and any offsite locations dedicated to the construction project"). The Court agrees that resolution of this dispute turns on whether the aggregate pits where picketing occurred constituted a "Project site."

The Court begins by looking to the PLAs' "express written terms" and interprets these "terms in the context of the entire agreement's language, structure, and stated purpose." *See, e.g.*, *Alday v. Raytheon Co.*, 693 F.3d 772, 782 (9th Cir. 2012) (citation omitted). The plain language of the PLAs requires employees to cross picket lines "established at the Project site" and prohibits the Union from encouraging work stoppages, picketing, "or other disruptive activity at the Contractor's project site[.]" Dkt. No. 1-1 at 25.

The provisions at issue in the five PLAs, with relevant differences in bold text, are excerpted as follows:

| Contract | Provisions |
| --- | --- |
| Sound Transit – Dkt. No. 1-1 at 25 | During the term of this Agreement there shall be no strikes, picketing, work stoppages, slow downs or other disruptive activity for any reason by the Union, its applicable Local Union or by any employee, and there shall be no lockout by the Contractor. Failure of any Union, Local Union or employee to cross any picket line established **at the Project site** is a violation of this Article. . . . |
| | The Union and its applicable Local Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity **at the Contractor's project site** and shall undertake all reasonable means to prevent or to terminate any such activity. |
| Port of Seattle – Dkt. No. | During the term of this PLA there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union, its applicable Local Union or by any employee, and there shall be no lockout by the Contractor on Covered Projects. Failure of any Union, Local Union or employee to cross any picket line established **at the Covered Project site** is a violation of this |

| 1-2 at 9 | Article. . . .<br><br>The Union and its applicable Local Union shall not sanction aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity **at the Contractor's Project site** and shall undertake all reasonable means to prevent or to terminate any such activity. |
|---|---|
| SCWA – Dkt. No. 1-3 at 24 | For the project covered by this SCWA, there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union, any applicable local Union or by any worker, and there shall be no lockout by the Contractor. Failure of any Union, local Union or worker to cross any picket line established **at Covered Project sites** violates this Article. . . .<br><br>The Union and every applicable local Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity **at the Contractor's project site** and shall undertake all reasonable means to prevent or to terminate any such activity. |
| KCCWA – Dkt. No. 1-4 at 25–26 | During the term of this CWA there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union, its applicable Local Union or by any employee, and there shall be no lockout by the Contractor. Failure of any Union, Local Union or employee to cross any picket line established **at the Project Site** is a violation of this Article. . . .<br><br>The Union and its applicable Local Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity **at the Contractor's project Site** and shall undertake all reasonable means to prevent or to terminate any such activity. |
| City of Seattle – Dkt. No. 1-5 at 13 | During this CWA, there shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity for any reason by the Union, any applicable local Union or by any worker, and there shall be no lockout by the Contractor. Failure of any Union, local Union or worker to cross any picket line established **at Covered Project sites** violates this Article. . . .<br><br>The Union and every applicable local Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity **at the Contractor's project site** and shall undertake all reasonable means to prevent or to terminate any such activity. |

While OMA tries to discredit the Union's interpretation of the term "project site," it ignores the text of the PLAs and instead jumps ahead to extrinsic evidence without establishing any ambiguity in the text. Dkt. No. 61 at 9–10; Dkt. No. 67 at 14–16. But OMA's argument that "project site" includes all locations where its drivers perform PLA work is not consistent with the plain language of the PLAs or OMA's own interpretation of those agreements. With respect to the latter, OMA concedes (and confirmed at oral argument) that the relevant agreements preserve drivers' right to honor the picket lines at the aggregate pits. Dkt. No. 67 at 6; *see also* Dkt. No. 71-1 at 8–11, 14–15. Because the PLAs state that "[f]ailure . . . to cross any picket line established at the *Project site* is a violation of this Article," *see, e.g.*, Dkt. No. 1-1 at 25 (emphasis added), and OMA agrees that drivers had the right to honor the picket lines at the aggregate pits, OMA's interpretation of "Project site" for purposes of this provision cannot include the aggregate pits. Yet

OMA also argues that the Union violated the following provision—which states that "[t]he Union . . . shall not sanction, aid or abet, encourage or continue any work stoppage, strike, picketing or other disruptive activity at the Contractor's *project site*," *see, e.g.*, *id.* (emphasis added)—by encouraging its members to honor picket lines at the aggregate pits. Dkt. No. 61 at 20; Dkt. No. 74 at 2. To make this argument work, OMA contends that "project site" includes those pits. *See, e.g.*, Dkt. No. 67 at 6–9; Dkt. No. 74 at 5–7, 11–12. Clearly, "project site" cannot possess two contradictory meanings at once. Basic contract interpretation and the plain text of the PLAs do not support OMA's internally inconsistent position.

Indeed, the Court need not look beyond the text of the PLAs to determine their meaning. Although most of the PLAs do not define the term "project site," the text of those agreements demonstrates that it does not extend to the aggregate pits. As shown in the above table, the PLA sections on which OMA relies, Dkt. No. 61 at 2–5, prohibit certain activity "at the Contractor's project site." The Sound Transit and Port of Seattle PLAs define "Contractor" as "all construction contractors and subcontractors of whatever tier *engaged in onsite construction work* within the scope of this PLA." Dkt. No. 1-1 at 3 (emphasis added); *see also* Dkt. No. 1-2 at 4 (same). The Port of Seattle PLA specifically describes "transportation of equipment and materials to the site" as "off-site work." Dkt. No. 1-2 at 5. That PLA also attaches a Letter of Understanding between the Port and the Union acknowledging that "much of the work" of truck drivers "is performed off site." *Id.* at 33. Such "off-site work" is clearly not "at" the project site. The City of Seattle CWA likewise distinguishes between "site" and "off site" work. Dkt. No. 1-5 at 6 ("Public works, also called project work, shall include site preparation and dedicated off site work"). The KCCWA states that the "Project Site" refers to "the location at which construction, equipment or services furnished by the Contractor under the Contract and this Agreement will be performed, completed and or delivered"; specifically, "[t]he project site is in the Georgetown neighborhood of Seattle

1    north of South Michigan Street, between 4th Avenue South and E. Marginal Way South." Dkt. No.

2    1-4 at 6–7. These provisions indicate that "project site" does not include the aggregate pits.

3         As the Union notes, some of the provisions of the PLA would not make sense if "Project

4    site" were to include all places OMA picked up material. Dkt. No. 70 at 4. For example, Union

5    stewards are "permitted on the Project site at all times" in all five PLAs. Dkt. No. 1-1 at 8; Dkt.

6    No. 1-2 at 8; Dkt. No. 1-3 at 15; Dkt. No. 1-4 at 11; Dkt. No. 1-5 at 11 ("Covered Projects site").

7    It would make little sense to permit them to be present at all times at aggregate pits where no

8    construction was occurring and where the pit workers' employers did not sign on to the PLAs.

9    Some of the other terms would not make sense either if read as broadly as OMA contends. For

10    example, the Port of Seattle PLA provides that "[p]arking shall be provided within 3 city blocks

11    or 1500 feet from the Covered Project site, whichever is shorter." Dkt. No. 1-2 at 20. The other

12    PLAs have similar provisions. Dkt. No. 1-3 at 9 (SCWA requiring that "no-cost parking [be]

13    available to workers within a four (4) block area from the project work site"); Dkt. No. 1-4 at 24

14    (KCCWA requiring that parking be provided at or near the "jobsite"); Dkt. No. 1-1 at 24 (Sound

15    Transit PLA providing same); Dkt. No. 1-5 at 7 (City of Seattle CWA requiring parking within "a

16    three (3) block radius of the project," and if dedicated parking is not possible, transportation

17    between a designated location and "the project worksite" must be provided). The parking

18    provisions thus suggest that "Project site" does not extend to the far reaches of the aggregate pits.

19    Furthermore, the Port of Seattle PLA states that "because of . . . the type of work being undertaken

20    on the Project site . . . visitors may be limited to certain times, or areas[.]" Dkt. No. 1-2 at 8. But

21    the Port of Seattle has no control over the visitors to the aggregate pits. Additionally, the KCCWA

22    requires that project rules be "posted at the Project Site," indicating that "project site" does not

23    include aggregate pits. Dkt. No. 1-4 at 24. Finally, the relevant PLA provisions' use of the word

24    "at" in their prohibitions of certain activity "*at* the Contractor's project site"—as opposed to a

broader term like "affecting"—shows that the parties meant to limit these provisions to activities occurring at the project sites.[7] The Court must read the PLAs as a whole and their terms in context. *Flores*, 519 F.3d at 1047.

Even if the PLAs' use of the term "project site" were ambiguous (it is not), it would not propel OMA past summary judgment. The CBA explicitly allows employees to honor picket lines, and none of the five PLAs provides otherwise (nor does either party argue they do). Dkt. No. 1-6 at 5.[8] Because a union's waiver of the right to engage in sympathy strikes and picketing must be clear and unmistakable, *see Children's Hosp. Med. Ctr.*, 283 F.3d at 1192, OMA's broad construction of the term "Project site" to waive workers' right to cross picket lines at all source locations even though the PLAs do not so state is not reasonable. Absent a clear waiver, the Court cannot find that Union members waived their Section 7 rights to honor picket lines at locations away from the construction site. And the PLAs' express waiver of the right to honor picket lines "at" a Project site, without a comparable waiver away from a Project site, shows that the PLAs did not clearly and unmistakably waive the right to honor picket lines away from a Project site. *See, e.g.*, *Flores*, 519 F.3d at 1047 (requiring courts to interpret CBAs' written terms in "the context of the entire agreement's language, structure, and stated purpose").

---

[7] The Sound Transit PLA and the KCCWA have a separate provision stating as follows:

> There shall be no strikes, picketing, work stoppages, slowdowns or other disruptive activity *affecting* the Project Site during the duration of this CWA. Any Union or Local Union which initiates or participates in a work stoppage in violation of this Article, or which recognizes or supports the work stoppage of another Union or Local Union which is in violation of this Article, agrees as a remedy for said violation, to pay liquidated damages in accordance with Section 18.6 of this Article.

Dkt. No. 1-4 at 26 (emphasis added); *see also* Dkt. No. 1-1 at 25. OMA has not argued that the Union violated this provision, nor has it advanced any argument whatsoever about this provision, and under the principle of party presentation, the Court must "presume that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, 825 F. App'x 440, 442 (9th Cir. 2020) (quotation marks and citation omitted). This principle is especially forceful "in a case such as this, involving a specialized area of civil law and competent, highly experienced counsel on both sides." *Id.*

[8] Each of the PLAs states that its terms prevail over any CBA, but if the PLA is silent on an issue, the terms of the CBA prevail. Dkt. No. 1-1 at 6; Dkt. No. 1-2 at 5; Dkt. No. 1-3 at 7; Dkt. No. 1-4 at 5; Dkt. No. 1-5 at 6.

1    In addition, Section 8(e)'s construction proviso is generally limited to onsite construction

2    work and does not cover delivering material to job sites, even though "some tasks in that process

3    might take place on a construction jobsite." *Joint Council of Teamsters No. 42*, 248 NLRB at 816.

4    Specifically, placing materials at the construction site is not within the scope of the proviso, and

5    not considered onsite construction work, when it "constitute[s] the final act of delivery rather than

6    jobsite construction work." *Jt. Council of Teamsters 42*, 225 NLRB 209, 217 (1976) (delivering

7    precast pipe by lowering segments into trench at construction site was not covered by the

8    construction proviso). Here, the no strike clause is limited to the "Project site," Dkt. No. 1-1 at 25,

9    and it is undisputed that no picketing or work stoppages occurred at the construction site where

10   OMA drivers delivered and sometimes spread material. Thus, OMA drivers' occasional spreading

11   of materials at a job site when they complete deliveries does not transform their offsite tasks into

12   onsite construction work. This argument does not help OMA.

13   Moreover, OMA's arguments in this vein conflate the issues of whether OMA is covered

14   by the PLA such that prevailing wage rates applied with requirements and limitations on striking

15   and picketing at the "Project site." Specifically, OMA argues that "most importantly, OMA drivers

16   are paid a prevailing wage for their work done on PLA projects emphasizing the importance of the

17   work performed for each project," so their work must be encompassed with the scope of the

18   "project site" or "covered project." Dkt. No. 61 at 22. The Court agrees with the Union that the

19   scope of Washington's prevailing wage law does not dictate the scope of the PLAs, Dkt. No. 70 at

20   22, and the parts of the PLAs addressing prevailing wage rates have no bearing on the meaning of

21   "project site" as used in the two provisions at issue.

22   Even if the PLAs were ambiguous and susceptible to more than one reasonable

23   interpretation, there is no genuine issue of material fact as to what the parties intended. First, as

24   discussed above, ambiguity as to whether the aggregate pits are encompassed in the term "project

1    site" cannot satisfy the clear and unmistakable standard. Second, OMA does not point to any

2    evidence rebutting the Union's showing that the negotiating parties did not intend "project sites"

3    to include the aggregate pits.

4         As the Union notes, OMA did not participate in the negotiations of the PLAs, so its intent

5    cannot create an issue of fact. Dkt. No. 55 at 6; *see also* Dkt. No. 56-1 at 229; Dkt. No. 58 at 2.

6    The negotiating parties' intent supports the conclusion that the Project site is limited to the

7    construction site. According to Margaret Newgent, a Union Business Agent who helped negotiate

8    the KCCWA, the Union's perspective of "[t]he basic quid-pro-quo in a PLA" was that it provided

9    "access to high-paying publicly-funded jobs in exchange for labor peace (i.e., no strikes or

10   picketing) *at those jobsites*"; "agreeing to labor peace in all circumstances, whether offsite or

11   onsite, is too high a price to pay for access to a limited number of high-paying publicly-funded

12   jobs." Dkt. No. 57 at 6. Sound Transit also intended its PLA to limit coverage to the construction

13   site and not to the aggregate pits. Dkt. No. 56-1 at 145, 236–37, 239, 241–43. The City of Seattle

14   publicly describes a PLA as a "job-site constitution." Dkt. No. 71-1 at 2. As noted above, the

15   County CWA expressly defines a covered "project site" or "site" as the "location at which

16   construction, equipment or services … will be performed, completed and/or delivered," which, for

17   that CWA, "is in the Georgetown neighborhood of Seattle north of South Michigan Street, between

18   4th Avenue South and E. Marginal Way South." Dkt. No. 1-4 at 6–7. The Schools have relied on

19   the Building Trades' position that the Schools CWA applies only to "on-site construction" work.

20   Dkt. No. 56-1 at 488. Similarly, the Executive Secretary for the Seattle/King County Building and

21   Construction Trades Council, who participated in negotiations for four of the PLAs, states that

22   they apply only "to work performed at the designated jobsite or at a dedicated off-site location."

23   Dkt. No. 58 at 3. The jobsite is "the physical location at which the construction work occurs," and

24   a "dedicated off-site location is a location outside of the jobsite that is for the sole purpose of

serving the construction of the PLA project." *Id.* Thus, he notes that PLAs' no-strike clauses prohibit strikes and picketing at the job sites but do not apply to off-site work. *Id.* at 3–4. And OMA's drivers uniformly testified that they did not believe that the aggregate pits were part of the jobsite. Dkt. No. 71-1 at 71, 90–91, 121, 136, 171–72, 180, 196, 208–09, 224, 226.

Therefore, the Union is entitled to summary judgment on OMA's claim that drivers were required to cross picket lines established at the source locations.

2.    Whether the Union's Communications with its Members Violated the PLAs

The Union contends that because the PLAs are silent regarding crossing picket lines established away from a Project site, the CBA controls the issue, and the CBA protects workers' right to honor primary picket lines if they so choose. Dkt. No. 55 at 20. Thus, the Union continues, it "did not violate any PLA when it informed OMA drivers that they had the right individually to decide whether to honor or cross the picket lines at concrete facilities." *Id.*

OMA does not dispute that the Union could inform its members of their rights. Dkt. No. 67 at 16–17. But OMA argues that the Union did more than that: it actively encouraged its members not to cross picket lines, resulting in work stoppages. *Id.* at 9.

The Court finds that the Union did not violate the PLAs by informing their workers that they could cross the picket lines or encouraging them to honor those picket lines. As set forth above, the PLA sections on which OMA relies require employees to cross picket lines at the project sites and prohibit the Union from encouraging disruptive activity at project sites, but the aggregate pits were not project sites (or "dedicated" off-site locations). *See, e.g.*, Dkt. No. 1-1 at 25; *see also* Dkt. No. 59 at 3 (the aggregate locations "have existed for years," they "deliver concrete to the general public," and they "were not created for any particular PLA job").

Although OMA argued during the hearing that honoring the picket lines resulted in a work stoppage at the project sites (i.e., drivers declining to dispatch to source locations where a strike

was occurring because they would not cross the picket lines), it has not submitted any evidence that project sites—the locations where construction was occurring—were impacted by the picketing at the aggregate pits. Rather, as noted above, OMA's dispatcher testified that when some of OMA's drivers refused to cross the picket lines, she was able to reroute them to other locations to pick up materials or dispatch other drivers to pick up the materials at the struck locations. Dkt. No. 71-1 at 32–34.[9] Moreover, even if it were true that sympathy strikes had an incidental effect on the workflow at the project site, the parties agree that union members had the right to engage in sympathy strikes. OMA cannot defeat that right by arguing that such incidental effects constitute a work stoppage; if the parties intended to prohibit offsite sympathy strikes due to the potential for such incidental effects, the law required them to say so clearly and unmistakably. *Children's Hosp. Med. Ctr.*, 283 F.3d at 1192. This they did not do.

The Court thus grants the Union's motion for summary judgment regarding the PLAs and denies OMA's motion.[10]

E.    **The Union Did Not Violate the CBA**

The Union argues that the CBA preserves OMA drivers' right to honor lawful picket lines, and thus their decision to do so was protected by Section 7 of the NLRA and by the CBA. Dkt. No. 55 at 22. In addition, it argues that it did not violate the no-strike clause because OMA drivers did not go on strike or engage in a work stoppage. *Id.*; *see also* Dkt. No. 70 at 17–18. The Union understands Section 13.01 to prohibit striking over contractual disputes that arise under the CBA, but not to prohibit strikes for any other reason such as "collective action by OMA drivers showing

---

[9] Mr. O'Young's declaration states that "due to the picketing at the source locations along with the encouragement and influence of the Union, OMA drivers were unable to pick up materials for projects." Dkt. No. 63 at 2. However, he does not state that PLA jobs were affected or provide further details.

[10] The Union argues in the alternative that the Union did not breach the PLAs because OMA drivers' work supplying materials is not covered by any PLA. Dkt. No. 55 at 21. Specifically, it contends that delivering materials is beyond the scope of the construction proviso. *Id.* at 21–22. Because the Union is entitled to summary judgment on its primary arguments, the Court does not consider this alternative argument.

1    solidarity for employees embroiled in labor disputes with employers at other companies" because

2    "those disputes do not arise under the OMA CBA." Dkt. No. 64 at 6.

3        OMA argues that while Section 3.01 "permits employees to observe picket lines, . . . it

4    does not obviate the Union's duties under Section 13.01." Dkt. No. 67 at 6 (citing Dkt. No. 68 at

5    4). As noted above, Section 13.01 states that "[i]n cases of violation, misunderstandings or

6    differences in interpretation or other disputes arising under this Agreement, there shall be no

7    reduction or stoppage of work." Dkt. No. 1-6 at 15. According to OMA, the Union violated Section

8    13.01 when it initiated a work stoppage by encouraging its members not to cross the picket lines

9    during the concrete strike despite the parties' on-going dispute "regarding whether the OMA

10   drivers could cross the picket lines at the source locations for PLA work." Dkt. No. 61 at 17–18;

11   *see also id.* at 19 (contending that "the Union influenced the drivers not to cross the picket lines

12   resulting in a work stoppage"). Unlike the PLAs, which the Union contends apply only at

13   construction sites, the Union concedes that the CBA applied everywhere Union drivers were

14   performing paid work for OMA under the CBA, including source locations. Dkt. No. 62-5 at 34.

15       OMA's claim fails for two reasons. First, as OMA's dispatcher testified, Section 3.01 gave

16   OMA's drivers the right to choose whether to cross lawful picket lines for PLA jobs. Dkt. No. 56-

17   1 at 174–75, 177. That right would be nonexistent if Section 13.01 were read to preclude them

18   from doing so. Courts cannot construe CBAs in a way that ignores some of the provisions. *See,*

19   *e.g.*, *Alday*, 693 F.3d at 784. Thus, the drivers' decision to honor the offsite picket lines at the

20   aggregate pits did not violate the CBA.

21       Second, the no strike clause at issue precludes work reductions or stoppages because of

22   disputes "arising under this Agreement"; i.e., the CBA Dkt. No. 1-6 at 16; *see also* Dkt. No. 61 at

23   17 (OMA noting that Section 13.01 "imposed a duty on the Union to prevent a work stoppage in

24   the event of a dispute or differences in CBA interpretation"). Although OMA acknowledges this

1   language, it does not identify any dispute that arose under the CBA. Dkt. No. 61 at 17. In its motion

2   for summary judgment, it states that "the Union was aware that there was a dispute between OMA

3   and the Union regarding whether the OMA drivers could cross the picket lines at the source

4   locations for PLA work." *Id.* But both parties agreed at the time that OMA's drivers had that right.

5   The Union communicated to OMA that its members had the right under the CBA "to honor any

6   lawful primary picket line authorized and erected by Teamsters Local 174," Dkt. No. 59 at 10, and

7   nothing in the record shows that OMA disputed that position at the time.

8        Communications between the parties during the strike are few and do not reflect a CBA-

9   based disputed. During the concrete strike, Mr. Hicks called Mr. O'Young to ask why OMA was

10  sending its drivers to "[his] picket line" at the sand and gravel companies instead of obtaining the

11  product OMA needed elsewhere. *See* Dkt. No. 62-6 at 13–15. Mr. O'Young responded that those

12  places were the only ones where he could obtain the product he needed. *Id.* at 13. Mr. Hicks does

13  not recall a continuing issue after that phone call. Dkt. No. 71-1 at 149. Neither Mr. Hicks nor Mr.

14  O'Young state that they raised a dispute arising under the CBA during that call or otherwise. *See*

15  *generally* Dkt. Nos. 62-6, 63. In another communication during the relevant time, Mr. Gasca wrote

16  to OMA to express the Union's views that employees had the right "to honor any lawful primary

17  picket line" authorized by the Union, but there is no evidence that OMA responded to that

18  communication or otherwise raised a dispute under the CBA. Dkt. No. 59 at 9–10. In addition,

19  OMA did not dispute that workers had the right to cross the picket lines at the aggregate pits and

20  communicated that to its drivers at the time. *See, e.g.*, Dkt. No. 71-1 at 8–11, 14–15. While some

21  drivers had questions about whether they could cross the picket lines, Dkt. No. 69-7 at 4–5, that

22  confusion does not reflect a dispute between the Union and OMA, who were the signatories to the

23  CBA, Dkt. No. 1-6 at 20. By its plain language, the CBA requires a predicate dispute *arising under*

24  *the CBA*. Dkt. No. 1-6 at 16. OMA has not identified such a dispute that existed at the time of the

alleged work stoppage or reduction. Accordingly, the Union is entitled to summary judgment on this claim and OMA is not.

### III.  CONCLUSION

For the foregoing reasons, the Court GRANTS the Union's motion for summary judgment, Dkt. No. 55, and DENIES OMA's motion for summary judgment, Dkt. No. 61.

Dated this 2nd day of July, 2025.

Lauren King
United States District Judge